UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/4/2024

—————————————————————————x

M.E. and J.E., individually and on behalf of G.E.,
a child with a disability,

                Plaintiffs,

    -against-                              1:22-cv-9642 (CM)

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                Defendant.

—————————————————————————x

DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This case is brought by M.E. and J.E. ("parents"), parents of a G.E., a child diagnosed with autism (collectively "Plaintiffs"), against the New York City Department of Education ("Defendant" or "district") under the Individuals with Disabilities in Education Act ("IDEA"). The parents are seeking retroactive reimbursement for private school tuition they paid on behalf of G.E. After a hearing before an Impartial Hearing Officer ("IHO"), Plaintiffs were denied reimbursement. Plaintiffs appealed to a State Review Officer ("SRO"), who affirmed the IHO's decision. Plaintiffs appeal the SRO's decision to this Court. As is customary in these cases, Plaintiffs moved for summary judgment (ECF No. 15) and the Defendant cross moved for summary judgment (ECF Nos. 24, 25).

For the reasons below, Defendant's cross motion for summary judgment is GRANTED and Plaintiffs' motion for summary judgment is DENIED.

## BACKGROUND

### I.    Facts and Procedural History

G.E. is a minor child born in December 2015. Evaluations in 2017 and 2018 revealed that G.E. met the criteria for a diagnosis of autism spectrum disorder. Pl. Ex. E at 2-3.[1] Following an evaluation by the Committee on Preschool Special Education ("CPSE") in June 2018, the CPSE approved a 12-month therapeutic nursery program in an 8:1+2 special class setting along with

---

[1] Citations to the administrative record, which was filed with this Court under seal, are to evidence admitted at the underlying impartial hearing before the IHO. The district's exhibits are referenced as "Def. Ex.," and the parents' exhibits as "Pl. Ex." Citations preceded by "Tr." are to pages from the transcript of the impartial hearing.

1

speech-language therapy, occupational therapy ("OT"), and physical therapy ("PT"). *Id.* at 3. G.E.'s parents described the 8:1+2 program as providing "a lot of support." Pl. Ex. N ¶¶ 4-5.

In early 2020, G.E.'s parents obtained a private psychological examination, memorialized in a report dated April 7, 2020 ("psychological report"). *See* Pl. Ex. E. The psychological report incorporated a February 2020 school progress report, which indicated that G.E. benefitted from 1:1 support and responded well to music. *Id.* at 3. The psychologist who conducted the examination recommended a small class size in a school that worked with children with neurodevelopmental disorders, close supervision, small group and individual learning experiences, and grouping with students who were developmentally similar. *Id.* at 16-17. The psychologist made other recommendations, such as a program that included music-based learning, a variety of individualized sensory experiences, and "[d]evelopmentally-informed psychotherapy, such as by using the Developmental Individual Differences Relationship-based (DIR) Model and related Floortime strategies" ("DIR/Floortime"). *Id.* at 17-19.

A Committee on Special Education ("CSE") convened on May 7, 2020 to develop G.E.'s IEP for the 2020-21 school year (kindergarten). Def. Ex. 6. The private psychologist who conducted the examination and wrote the report described above was present at the May 2020 CSE meeting and provided input. *Id.* at 2, 26.

The May 2020 IEP incorporated many of the results from the psychological report, including the results from the Wechsler Preschool and Primary Scale of Intelligence, Fourth Edition (WPPSI-IV), the Autism Diagnostic Observation Schedule, Second Edition (ADOS-2), and the Behavior Assessment System for Children, Third Edition (BASC-3), average scores in the areas of aggression, anxiety, and somatization, and G.E.'s strengths and weaknesses in other areas. *Compare* Def. Ex. 6 (May 2020 IEP) at 1-6, 23 *with* Pl. Ex. E (psychological report) at 1, 10-16,

2

20-21. The May 2020 IEP also included recommendations that were made in the report that followed the psychological examination, including OT, PT, speech-language therapy, close supervision, small group and individual learning experiences, sensory activities and supports, self-regulation support, hands-on activities, music, movement breaks, a multi-sensory approach, visual supports, gestures, oral safety, processing time, communication with parents, and more. *Compare* Def. Ex. 6 at 7, 18-19 *with* Pl. Ex. E at 16-19. The May 2020 IEP recommended a 12-month school year including a 6:1+1 special class placement in a district specialized school. Def. Ex. 6 at 18, 24. The IEP did not, however, suggest use of the DIR/Floortime model.

The parents did not agree with the district's placement and G.E. began attending the Rebecca School ("Rebecca"), a private school, in September 2020. Def. Ex. 5 at 1. A December 2020 interdisciplinary developmental summary ("interdisciplinary summary") from Rebecca indicated that the school utilized the DIR/Floortime model and offered OT, PT, speech-language therapy, music-based learning, and more. *Id.* G.E.'s class included a total of seven students, a head teacher, and three teaching assistants (7:1+3). *Id.*

A CSE convened on March 9, 2021 to conduct G.E.'s annual review and develop her IEP for the 2021-22 school year (first grade). Pl. Ex. C. G.E.'s mother and members of Rebecca staff were present at the March 2021 CSE meeting. *See* Def. Exs. 2, 3.

At the March 2021 meeting, the CSE reviewed the May 2020 IEP and the interdisciplinary summary. Pl. Exs. C at 1; D at 2. The March 2021 CSE considered a 6:1+1 class size, which it deemed "too restrictive" for G.E., and a 12:1+1 class size, which it considered insufficiently supportive. Pl. Exs. C at 20; D at 2. Ultimately, the March 2021 IEP recommended a 12-month school year, including an 8:1+1 special class placement, augmented with 1:1 instruction in English language arts ("ELA") and math, as well as OT, PT, speech-language therapy, adapted physical

3

Case 1:22-cv-09642-CM Document 34 Filed 04/08/24 Page 5 of 30

education, special transportation, and group parent counseling and training. Pl. Ex. C at 14-16, 18-19. The March 2021 IEP addressed G.E.'s sensory needs, including the need for repetition, modeling and frequent opportunities for practice, visual supports/cues, visual/verbal/gestural/physical prompts, segmenting tasks, movement breaks, redirection, chunking verbal information into smaller units, processing time, hands-on activities, a multisensory approach to activities, sensory tools, close supervision, music activities, positive reinforcement, communication with parents, social stories, quiet places, labels for organization, trusting relationships, and collaboration. Pl. Ex. C at 5-6. The March 2021 CSE meeting minutes and March 2021 IEP note the parents' input on a number of concerns, including G.E.'s challenges with virtual learning, the need for quiet spaces, the appropriateness of the 8:1+1 placement, and more. Pl. Ex. C at 3-5, 20; Def. Ex. 3 at 1-4.

G.E.'s parents executed an enrollment contract for G.E.'s attendance at Rebecca for the 2021-22 school year (beginning on July 1, 2021) on May 12 and May 14, 2021. Pl. Ex. J. Plaintiffs paid G.E.'s tuition on May 26, 2021. Pl. Ex. L.

In a notice dated June 2, 2021 – one week after the parents had paid tuition to secure G.E.'s spot at Rebecca – the school district notified G.E.'s parents of the March 2021 CSE's determination that G.E. was eligible for special education services, identified the evaluative information considered (including the May 2020 IEP), identified the recommended special education program and services, and advised the parents of their due process rights. Pl. Ex. D at 1-4. In a letter ("placement letter") – also dated June 2, 2021 – the district notified G.E.'s parents of the particular public school site to which it assigned G.E. for the 2021-22 school year. *Id.* at 5. The placement letter informed the parents that they could visit the school and provided the parents with the school's contact information. *Id.*

4

The parents sent a letter to the district, dated June 16, 2021, stating their position that the March 2021 IEP, particularly the 8:1+1 special class placement, was not appropriate. Pl. Ex. B at 1-2. In this letter, the parents expressed their intention to place G.E. at Rebecca for the 2021-22 (first grade) school year and to seek reimbursement from the district. *Id.*

On or around July 26, 2021, G.E.'s parents requested an impartial hearing, alleging that the district denied G.E. a free and appropriate public education ("FAPE") for the 2021-22 school year. Pl. Ex. A. The parents alleged that the district failed to provide the parents with a meaningful opportunity to participate in the development of the March 2021 IEP, failed to provide them with certain documentation, predetermined the CSE's recommendations, and failed to consider appropriate evaluative materials, particularly the April 2020 psychological report. *Id.* at 2-4. The parents asserted that the 8:1+1 class ratio was inappropriate and that G.E. required a 2:1 classroom that utilized the DIR/Floortime methodology. *Id.* The parents also complained that they were unable to assess the proposed public school placement because nobody from the proposed school responded to their inquiry. *Id.* at 4. G.E.'s parents requested tuition and costs for Rebecca for the 2021-22 school year, as well as reimbursement for other related expenses. *Id.* at 5

## II. The Hearing and the IHO's Decision

A hearing was held on March 11, 2022. The IHO received testimony from three witnesses: G.E.'s mother; Ms. Lewin, the district's school psychologist; and Ms. McCourt, the director of Rebecca. Tr. 18.

At the hearing, G.E.'s parent testified that the April 2020 psychological report was not reviewed at the March 2021 CSE meeting. Tr. 71. The school psychologist testified that, although

5

she did not attend the March 2021 CSE meeting, she knew that the May 2020 IEP was reviewed at the CSE meeting, which meant that information from the April 2020 psychological report was necessarily reviewed at that meeting, since it was incorporated into the May 2020 IEP. Tr. 38, 46-49.

The district's school psychologist testified that the 8:1+1 placement would provide G.E. with the "intensive supervision" and "constant support" required for her to make progress. Tr. 44. She also testified that G.E. had made behavioral improvements since the May 2020 IEP, which had recommended a 6:1+1 class size, was developed. Tr. 58-59. On the issue of teaching methodology, the district psychologist testified that DIR/Floortime was not the only teaching methodology appropriate for students with autism, and that the March 2021 CSE had no evidence that G.E. could make progress only if she were taught using the DIR/Floortime methodology. Tr. 53, 61-63.

Rebecca's director testified about Rebecca's offerings and how they could be helpful to G.E. *See* Tr. 84-100, 103. The director testified that the DIR/Floortime methodology is designed to address sensory needs, communication problems, and learning difficulties, as well as to help students regulate emotions. Tr. 88-90; *see also* Pl. Ex. M ¶ 13. She did not opine on the appropriateness of the March 2021 IEP, except to say that the management tools provided in the IEP would support and benefit G.E. Tr. 102-103.

In a decision dated March 17, 2022, the IHO determined that the March 2021 IEP was both procedurally and substantively adequate, offered G.E. a FAPE, thus rendering her parents ineligible for tuition reimbursement at their chosen private placement. Impartial Hearing Officer's Decision (ECF No. 21 at 34-44) ("IHO Dec.") at 10. The IHO found that G.E.'s parents' interpretation of the psychological report was "too restrictive," amounted to a "wholesale rejection

of all 6:1+1 or 8:1+1" class settings, and was speculative. *Id.* The IHO found that G.E.'s parents offered no evidence to support their belief that the 8:1+1 class size would offer no educational benefit to G.E. and that their insistence on a 2:1 ratio in a school that utilized DIR/Floortime was simply a way to get the district to subsidize G.E.'s attendance at Rebecca, because the district offered no such program. *Id.*

Although the IHO recognized that it was unnecessary to reach the appropriateness of the placement or the equitable considerations, the IHO determined that placement at Rebecca was appropriate, but that equities weighed against reimbursement. *Id.* at 10-11. On the issue of the equities, the IHO found that the parents had no intention of sending G.E. to a public school and that the parents' actions were unreasonable. *Id.*

### III.    Appeal to the SRO

The parents appealed the IHO's decision, arguing that the IHO erred in finding both that the district offered G.E. a FAPE and that the parents had impeded the district's ability to provide G.E. with a FAPE. Decision # 22-048 of a State Review Officer (ECF No. 21 at 7-32) ("SRO Dec.") at 7-8; Notice of Intention to Seek Review (ECF No. 21 at 53). The parents delineated several issues for review: (1) the IHO failed to properly weigh the credibility of all the witnesses and improperly credited the district's only witness without explaining her reasoning; (2) the IHO failed to address the parents' claims regarding the procedural deficiencies in the IEP, including that the IHO improperly shifted the burden of proof to the parents to demonstrate that the IEP was inappropriate; (3) the IHO erred in finding that the March 2021 IEP was substantively appropriate; and (4) that the district failed to establish, and the IHO erred in finding, that the proposed

7

placement was capable of implementing the March 2021 IEP. SRO Dec. at 7-8; Verified Request for Review (ECF No. 21 at 56-63).

The SRO affirmed the IHO's decision.

## A. Procedural Adequacy

### 1. Burden of Proof

Under New York law, the district has the burden of proof in an impartial hearing to demonstrate the adequacy of an IEP. SRO Dec. 11 (citing N.Y. EDUC. LAW § 4404(1)(c)). While the IHO's language appeared to suggest an improper shifting of the burden of proof,[2] the SRO found that the IHO did not actually shift the burden of proof when conducting her analysis. *Id.* at 11-12. The IHO recited the correct burden of proof in its decision, "made detailed findings of fact" and "found that the district's evidence supported a finding of a FAPE." *Id.* at 12. Since "the available evidence in the hearing record led the IHO to find that the IEP adequately addressed the student's needs and that there was no contrary evidence that would rebut that conclusion . . . the actual analysis of the relevant evidence by the IHO did not represent a shift of the burden of persuasion to the parent to demonstrate the IEP's substantive deficiency." *Id.*

Moreover, the SRO held that even if the IHO had misallocated the burden of proof, that error would not require reversal because this is not a case "in which the evidence was in equipoise." *Id.* (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005) and *M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 225 n.3 (2d Cir. 2012)).

---

[2] For example, the IHO stated that "the [p]arents provided no evidence to support their belief that the recommended 8:1:1 special education class alongside the suite of recommended services would not offer educational benefits and afford meaningful academic progress to autistic students like their child." IHO Dec. 10.

8

2.  Credibility of the District's Witness

The SRO disagreed with the parents' argument that the IHO erred in according undue credibility to the district's witness (the school psychologist), who was not a special education teacher, had never met G.E., and did not attend the March 2021 CSE meeting. SRO Dec. 12. The SRO found that "the IHO did not make specific credibility findings and appropriately weighed all of the available evidence before her." *Id.* Additionally, the SRO reviewed the entire hearing record and reached the same determination regarding the sufficiency of the CSE's recommended program. *Id.*

3.  CSE Process

i.  Parental Participation

Based on the March 2021 CSE meeting minutes and the March 2021 IEP, the SRO found that G.E.'s parents were able to participate meaningfully in the development of G.E.'s IEP. *Id.* at 13. Although the parents disagreed with the CSE's recommendations, the record revealed that G.E.'s mother attended the IEP meeting and voiced her concerns, and so had an adequate opportunity to participate in the development of G.E.'s IEP. *Id.*

ii.  Consideration of the Most Recent Evaluation

The SRO upheld the IHO's finding "that the district presented credible evidence that the March 2021 IEP was reasonably designed to comprehensively respond to the student's unique needs as outlined by the April 2020 psychological [examination] as well as other information provided to the CSE team and discussed at the CSE meeting." SRO Dec. 13.

The SRO reviewed the May 2020 IEP. It concluded that the May 2020 CSE had reviewed and included in the May 2020 IEP findings and recommendations from the April 2020

psychological report. *Id.* at 14-15 (comparing Def. Ex. 6 (May 2020 IEP) at 1-6, 23 with Pl. Ex. E (psychological report) at 1, 10-16). Thus, the SRO concluded that the March 2021 CSE took the psychological report into consideration. *Id.* at 15.

### B.  Substantive Adequacy

For the reasons below, the SRO concluded that the IEP was substantively adequate.

1.  8:1+1 Special Class Placement

Although the psychological report indicated that G.E. requires a small classroom with enough staff to provide consistent support, it did not define "small class size." SRO Dec. 18-19. The SRO noted that state regulations provide that 8:1+1 class sizes are intended to serve students with intensive needs who require significant attention, and that G.E.'s parent had found G.E.'s 8:1+2 pre-school class to be supportive several years earlier. *Id.* (citing 8 N.Y.C.R.R. § 200.6(h)(4)(ii)(b)).

While the 8:1+2 ratio from G.E.'s preschool and the 7:1+3 ratio in her Rebecca placement (plus, of course, the 2:1 DIR/Floortime ratio) differ from the 8:1+1 recommendation in the March 2021 IEP in terms of school personnel assigned to the class room, the SRO found that this alone did not render the IEP inadequate, since "districts are not required to replicate the identical setting used in private schools." *Id.* at 19-20 (citing *M.C. v. Mamaroneck Union Free Sch. Dist*, 2018 WL 4997516, at *28 (S.D.N.Y. Sept. 28, 2018) and *Z.D. v. Niskayuna Cent. Sch. Dist.*, 2009 WL 1748794, at *6 (N.D.N.Y. June 19, 2009)). The child was being offered 1:1 instruction in both English and math – something that the private school did not offer – as well as multiple therapies.

Ultimately, the SRO found that the hearing record supported a finding that, based on the information available to the March 2021 CSE, the 8:1+1 recommendation was sufficiently

10

supportive to address G.E.'s needs and provide an educational benefit. *Id.* at 20. The SRO relied on the school psychologist's testimony that G.E. had made improvements since the May 2020 IEP was developed, that the CSE considered other class sizes, and that the March 2021 IEP provided opportunities for individual instruction and attention. *Id.* at 20-21.

Therefore, the SRO concluded that the 8:1+1 class size recommendation did not deny G.E. a FAPE. *Id.* at 21.

## 2. Methodology

The SRO held that the IEP's failure to require the use of the DIR/Floortime methodology did not render it substantively inadequate. The SRO found that the psychological report did not specifically recommend that G.E. be taught using DIR/Floortime; neither did that report indicate that this or any particular pedagogical method was necessary for G.E. to make educational progress. The private psychologist who conducted the psychological examination only "identified the DIR/Floortime methodology as an example of a methodology that the student could benefit from." SRO Dec. at 22.

Because the March 2021 IEP "comprehensively described [G.E.'s] sensory, self-regulation and communication needs and recommended a variety of supports, strategies and services to address those needs," and because none of the evidence indicated that DIR/Floortime was required for G.E.'s progress, the SRO found that the March 2021 IEP's omission of DIR/Floortime did not amount to a denial of a FAPE. *Id.* at 23.

## 3. Ability of the Assigned Public School to Implement the IEP

The parents argued that they were unable to tour the proposed public school to assess its sufficiency. SRO Dec. 23. Quoting a letter by the United States Department of Education's Office

11

of Special Education Programs ("OSEP"), the SRO noted that "the IDEA does not provide a general entitlement to parents of students with disabilities . . . to observe proposed school placement options for their children." *Id.* at 24 (quoting *Letter to Mamas*, 42 IDELR 10 (OSEP 2004), and collecting cases). However, parents do have a right to obtain information about an assigned public school. *Id.* at 25 (collecting cases).

Here, the parents claim to have called the proposed public school immediately after receiving the June 2, 2021, placement letter, and were told that they would hear back after July 4, 2021, which the parents claim never happened. *Id.* at 6, 25. However, G.E.'s parent did not indicate that she asked specifically for an opportunity to visit the school, and the record was unclear whether the parents made any other efforts to obtain information from the school. *Id.* at 25. Moreover, the parents did not mention in their notice of unilateral placement that they had been unable to visit the school. *Id.*; *see* Pl. Ex. B.

Ultimately, the SRO found the parents' challenge to the proposed public school placement's ability to implement the IEP to be too speculative. Moreover, this was not a case where the parents made repeated efforts to obtain information from the school and the school consistently delayed or failed to respond. SRO Dec. 25. For these reasons, the SRO found that the record did not support a finding that the district denied G.E. a FAPE by not providing her parents with sufficient information about the assigned public school site. *Id.*

## C. Appropriateness of the Unilateral Placement & Equitable Considerations

Having found that the IEP was substantively and procedurally adequate, the SRO found it unnecessary to reach the second and third prongs of the *Burlington/Carter* test. However, the SRO did note that even if the parents had no intention of placing G.E. in the public school, as found by

12

the IHO, that would not be a basis to deny reimbursement. SRO Dec. 26 n.11 (citing *E.M. v. N.Y. City Dep't of Educ.*, 758 F.3d 442, 461 (2d Cir. 2014) and *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840 (2d Cir. 2014)).

## PROCEDURAL POSTURE

Having exhausted their administrative remedies, the parents of G.E. bring suit for reimbursement of the cost they incurred to send their daughter to Rebecca during the 2021-22 school year. The district opposes the application.

When an action is brought under the IDEA to appeal a final decision of the SRO, the Second Circuit has recognized summary judgment as the procedural mechanism for reviewing such administrative decisions. *A.C. ex rel. M.C. v. Board of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).

Plaintiffs moved for summary judgment, requesting that the Court reverse the decisions of the IHO and SRO, find that G.E. was denied a FAPE, order the district to reimburse G.E. for amounts paid to Rebecca for the 2021-22 school year, and find that Plaintiff is entitled to reasonable attorneys' fees and expenses. Defendant cross moved for summary judgment, asking the Court to dismiss Plaintiffs' complaint in its entirety.

Plaintiffs argue that this Court should overturn the findings of the IHO and the SRO because their decisions are "poorly reasoned and unsupported by the record." Pl.'s Mem. Opp'n & Reply Def.'s Cross Mot. Summ. J. (ECF No. 30) 1 (quoting *S.B. v. N.Y. City Dep't of Educ.*, 2017 WL 4326502, at *9 (E.D.N.Y. Sept. 28, 2017)). Specifically, Plaintiffs challenge the following aspects of the SRO's decision: applying the improper burden of proof, giving undue weight to Defendant's witness, failing to consider Plaintiffs' witness, finding that the parents were

13

not denied a meaningful opportunity to participate in the IEP process, finding that the CSE considered appropriate evaluative material, finding that the CSE did not predetermine G.E.'s recommended program, finding that the CSE recommended an appropriate program for G.E., and failing to consider the cumulative impact of Plaintiffs' alleged procedural errors. Compl. (ECF No. 1) ¶¶ 74-122.

For the reasons set forth below, I reject Plaintiffs arguments.

## STANDARD OF REVIEW

The standard of review in an appeal from the decision of an SRO is well settled.

We start from the proposition that under the IDEA, a public school district is obligated only to provide disabled students with a FAPE. A FAPE is not required to maximize the potential of a student with a disability, but is only required to provide a program wherein the student can make meaningful progress. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 189, 197 n.21, 199 (1982); *see also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 580 U.S. 386, 402-403 (2017) (holding that the IDEA demands more than "merely more than *de minimis*" progress from year to year); *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998). In other words, the law only requires the district to provide an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012) (internal quotation omitted). Therefore, a district meets its obligation under the IDEA if it provides "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203.

14

The SRO's decision is subject to judicial review. However, as the United States Supreme Court has cautioned, this fact "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities." *Rowley*, 458 U.S. at 206. Federal courts may not simply rubber stamp administrative decisions, but they must give "due weight" to the results of administrative proceedings, mindful that judges lack the specialized knowledge and experience required to resolve persistent and difficult questions of educational policy. *Walczak*, 142 F.3d at 129; *see also Mr. P v. West Hartford Bd. of Educ.*, 885 F.3d 735, 748 (2d Cir. 2018).

As the Second Circuit has noted, "Deference is particularly appropriate when," as here, "the state hearing officers' review has been thorough and careful." *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d Cir. 2008) (quoting *Walczak*, 142 F.3d at 129). In this regard, I must note that the decisions of both the IHO and the SRO explore the evidence thoroughly, make detailed factual findings that are supported by the evidence, and cogently explain the reasons for the conclusions they reach. The SRO's decision is well-reasoned and well-supported by citations to relevant portions of the record. It is owed the degree of deference I am expected to give it.

Claims for reimbursement for unilateral private school placement are assessed under the *Burlington/Carter* test, which considers (1) the appropriateness of the IEP, (2) the appropriateness of the unilateral placement, and (3) equitable considerations. *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993); *Sch. Comm. Of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985). "If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end." *M.C. ex rel. Mrs. C v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000).

## **DISCUSSION**

### **I.     Burden of Proof and Consideration of Witness Testimony**

In New York, the district has the burden of demonstrating the adequacy of an IEP. N.Y. EDUC. LAW § 4404(1)(c). Plaintiffs' argument that the IHO and SRO shifted the burden to them is without merit. Both the IHO and the SRO found that the district's evidence supported the IEP's adequacy. I agree. The district provided testimony from its school psychologist, the May 2020 and March 2021 IEPs, the CSE meeting minutes, and G.E.'s interdisciplinary summary. This is enough evidence for the district to carry its burden.

Plaintiffs also contend that the IHO failed to give proper weight to the testimony of Plaintiffs' witness, Ms. McCourt, who testified about G.E.'s needs and Rebecca's offerings. Plaintiffs' contention is false. The IHO addressed Ms. McCourt's testimony and noted that "[s]he did not provide an opinion on the appropriateness of the IEP." IHO Dec. 7 (citing Tr. 103). Moreover, this is an appeal from the SRO's decision, not the IHO's. The SRO also discussed Ms. McCourt's written and oral testimony, which described Rebecca's class size and teaching methodology. *See* SRO Dec. 19, 21-22. After considering Ms. McCourt's testimony, the SRO weighed all of the evidence and concluded that G.E. could make progress in an educational setting that did not directly replicate Rebecca's program. *Id.* at 19-20, 22.

Nor did the IHO (or SRO) give defendant's witness's testimony undue weight. Neither the IHO nor the SRO relied solely on Ms. Lewin's testimony. The SRO reviewed the entire record and came to the same conclusion as the IHO. I see no reason to disturb the SRO's decision on this basis. Not a scintilla of evidence suggests that the SRO gave Ms. Lewin's testimony "undue weight."

16

## II.     The IEP Is Not Procedurally Inappropriate

Procedural inadequacies in an IEP do not automatically invalidate the plan or establish that the child has been denied a FAPE. Rather, a hearing officer may find a child did not receive a FAPE only if procedural inadequacies: (i) compromised the child's right to a FAPE; (ii) seriously hampered the parent's right to participate in the process; or (iii) constituted a departure of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

The parents argue that the IEP was procedurally inadequate because the CSE did not consider G.E.'s most recent evaluation and because the parents were unable to meaningfully participate and obtain information throughout the IEP process. Moreover, the parents assert that the SRO failed to consider the cumulative effect of these procedural violations.

For the reasons below, I find no error in the SRO's decision.

### A.  The CSE Considered G.E.'s Most Recent Evaluation

A CSE must consider the results of the initial or most recent evaluation. 34 C.F.R. § 300.324(a)(1)(iii); 8 N.Y.C.R.R. § 200.4(d)(2). Consideration of an evaluation, however, does not mean that every member of the CSE has to read the document, or that the CSE needs to accord an evaluation by a privately retained expert any particular weight. *Mr. P*, 885 F.3d at 753.

Plaintiffs assert that the IEP was procedurally inadequate because the March 2021 CSE failed to consider "[t]he results of the initial or most recent evaluation of the child," specifically, the April 2020 psychological report. Pl.'s Mem. Supp. Mot. Summ. J. (ECF No. 16) ("Pl. Mem. Supp.") 12 (quoting 34 C.F.R. § 300.324(a)(1)(iii)). Moreover, Plaintiffs argue that the CSE must use a variety of assessment tools and that the district has the burden of demonstrating which evaluative materials were reviewed by the CSE when developing the IEP, which it failed to carry.

17

Specifically, Plaintiffs argue that the CSE erred by failing to conduct its own psychological evaluation of G.E. at public expense, and by reviewing the May 2020 IEP – which contained only excerpts from the psychological report – rather than reviewing the report itself. Plaintiffs claim that it is "inexplicabl[e]" that the CSE relied on information from the May 2020 IEP yet increased the recommended class size from 6:1+1 (from the 2020 IEP) to 8:1+1 (recommended in the 2021 IEP). *Id.* at 13.

Plaintiffs also argue that the SRO improperly compared the March 2021 IEP with the psychological report without discussing whether the CSE actually considered the April 2020 psychological report when developing the March 2021 IEP. According to Plaintiffs, this disregarded the Second Circuit's decision in *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95 (2d Cir. 2016), which provided that a lower court's "conclusion that what mattered was the existence of evaluative materials at the time of the relevant CSE meeting that corroborated the terms of the IEP misses the point. The statute requires that a CSE actually review evaluative data and base the terms of the student's IEP on that information." 822 F.3d at 110-11. In other words, Plaintiffs claim that the SRO cannot simply speculate how the CSE reached the terms of G.E.'s IEP, but instead must consider whether the evaluative data on which the district claims to rely was actually considered at the CSE meeting. Plaintiffs conclude that the failure to consider evaluative mater was a "serious violation" that "led to a substantively inappropriate program recommendation for G.E." Pl. Mem. Supp. 14.

The district does not contend that it considered those portions of the 2020 psychological report that were not discussed in the 2020 IEP. Instead, it argues that it complied with the plain language of the relevant regulation, which requires that the IEP team "*consider* . . . [t]he *results* of the initial or most recent evaluation of the child." 34 C.F.R. § 300.324(a)(1)(iii) (emphasis added);

18

*see* Def.'s Reply Mem. Law (ECF No. 31) 5-6 ("Def. Reply Mem."). Because the district considered the May 2020 IEP when developing the March 2021 IEP – and because the May 2020 IEP included the test results and findings from the 2020 psychological report – the CSE satisfied its obligation. The SRO agreed.

Plaintiffs mischaracterize the Second Circuit's decision in *L.O.* There, the issue was that the CSE did not memorialize how it reached the terms of the IEP – did not say on what evidence it relied – and so the SRO invented *post hoc* justifications for the IEP based on evaluative material that was in *existence* at the time that the IEP was developed. Put otherwise, the SRO imagined what the CSE could have reviewed, without having any assurance that this material was actually reviewed. *L.O.*, 822 F.2s at 110-11. The Second Circuit held that this was insufficient. *Id.*

But that is not what has happened here. Unlike *L.O.*, the SRO here did not look to what evidence was in existence that would support the CSE's recommendation and then assume that the CSE must have reviewed and relied on that evidence. In this case, the SRO did not need to guess what the CSE relied on: the record clearly indicates exactly what materials the CSE relied on in devising the IEP. It indicates that the March 2021 CSE reviewed anything from the 2020 psychological report that was discussed in the May 2020 IEP, including specifically the test results and the psychologist's recommendations. Since the April 2020 psychological report was the most recent evaluation of G.E., the fact that the CSE reviewed a document that incorporated its results and recommendations gave the SRO sufficient basis to conclude that the March 2021 CSE actually relied on G.E.'s most recent evaluative data. There is no requirement that every member of the CSE read the actual document or that there be a substantive discussion of the evaluation. *Mr. P*, 885 F.3d at 753. Moreover, the parents point to nothing in particular from the April 2020 psychological report that was *overlooked*, as opposed to *considered and rejected*, by the CSE –

notably the psychologist's statement that G.E. could benefit from use of the DIR/Floortime Method, with its 2:1 classroom size. Therefore, I find no reason to disturb the SRO's finding that the March 2021 CSE properly relied on G.E.'s most recent evaluative data to develop the March 2021 IEP.

Plaintiffs' argument that CSE did not conduct an evaluation at public expense leads nowhere. To be clear, Plaintiffs do not argue that the failure to conduct an evaluation at public expense was itself a procedural violation. Rather, Plaintiffs argue that, by not conducting such evaluation, the CSE was bound to accept the recommendations in the 2020 psychological report, which was the most recent evaluation.

But the parents misstate the standard. A CSE is required only to consider the data in the most recent evaluation; it is not required to follow every recommendation in that evaluation. That is true whether the evaluation is conducted by the district or privately, by someone contracted by the parents. *Mr. P*, 885 F.3d at 753.

Here, significantly, the SRO found that the March 2021 IEP was consistent with the evaluative data included in the May 2020 IEP and accounted for G.E.'s progress, and I agree. Therefore, the CSE's failure to conduct an evaluation at public expense did not render consideration of the May 2020 IEP insufficient and so did not render the May 2021 IEP procedurally inappropriate.

## B. The Parents Were Able to Meaningfully Participate and Obtain Information

Plaintiffs argue that the district failed to offer G.E.'s parents an opportunity to meaningfully participate at the IEP meetings and that the CSE predetermined G.E.'s program. The basis for their

20

belief is that the district did not incorporate Plaintiffs' concerns and suggestions into the March 2021 IEP.

The fact that the IEP did not include the parents' preferred ideas does not mean that the parents were deprived of the right to participate in the process. If that were the standard, then a FAPE would entitle a child to the education that a loving parent desired – which, as we all know, is not the standard. The evidence demonstrates, as the SRO found, that the parents had the opportunity to place their concerns before the CSE, which is all that is required for them to have a meaningful opportunity to participate in the process of formulating an IEP for their child. The fact that the CSE did not adopt their suggestions does not mean that they were denied their opportunity to participate. *See P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008) ("The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP[] . . . . A professional disagreement is not an IDEA violation.")

Nor does the evidence support the parents' argument that the CSE predetermined the contents of G.E.'s IEP. Rather, as the SRO found, the evidence shows that the CSE considered several different placements for G.E., including one that was more restrictive (and that conformed to the suggested placement in the 2020 IEP, which the parents rejected), as well as one that was less restrictive (a 12:1+1 classroom). The CSE eventually chose the intermediate placement (8:1+1) after considering the progress that G.E. had made over the preceding year – progress that suggested she might be able to handle a less restrictive placement, with the help of 1:1 instruction in certain subjects and extra therapies. The district does not offer a 2:1 placement of DIR/Floortime, and the CSE concluded that placing her at Rebecca (which is what the parents wanted) failed to take her progress into account. The impact of progress is to allow a child to move

toward less restrictive alternatives – not to keep her in the most restrictive placement. *See M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) ("Under an IEP, education must be provided in the least restrictive setting consistent with a child's needs.") (internal quotation marks omitted).

The CSE considered three alternatives and made a considered judgment that G.E. – who had thrived in a pre-school with eight children in the classroom and a kindergarten class with seven students in the classroom – could handle an 8:1+1 classroom. Nothing in the evidence suggests that this outcome was predetermined and the parents' argument is conclusory and utterly without support in the record.

Additionally, Plaintiffs argue that they were denied an opportunity to obtain information about the placement school. Plaintiffs contacted the assigned school on June 2, 2021 after receiving the placement letter and were told that someone would return their call after July 4, 2021. Plaintiffs state that they never got a call back.

I find no error in the SRO's conclusion that the parents were not deprived of their right to participate in the process. The parents did not really try to participate. They had already signed up for (and paid for) the following year at Rebecca; they had no intention of sending G.E. to public school, which did not offer the sort of highly restrictive placement that they wanted for their daughter. As a result, they made only a token effort to look at the school to which she was assigned pursuant to the IEP; a single phone call, with no call back and no concerted effort to get an appointment to look at the school, and no request for written information about the school. There is not a scintilla of evidence that anyone at the district hampered the parents' ability to look at the assigned school while it was in summer session or that anyone refused to provide the parents with

22

information. They were not really interested in, and so did not actively seek, the information they claim to have been denied. Therefore, this is no basis to find a procedural violation.

## C. Consideration of the Cumulative Effect of the Procedural Violations

Finally, Plaintiffs argue that the SRO failed to consider all of the procedural violations together to determine whether, as a whole, they amounted to a denial of a FAPE. Plaintiffs argue that the failure to analyze the cumulative effect of the procedural violations is reversible error.

Since the SRO correctly concluded that there were no procedural violations, it was hardly error not to consider these issues cumulatively. It is only the failure to consider *violations* cumulatively that constitutes a denial of a FAPE.

## III.    The IEP is Not Substantively Inappropriate

On appeal to this Court, Plaintiffs argue that the March 2021 IEP is substantively inappropriate because the IEP recommends an 8:1+1 class size and does not recommend the DIR/Floortime methodology. But, as the SRO correctly held, there is no basis to conclude that the IEP is substantively inappropriate.

## A. The March 2021 IEP's Recommendation of an 8:1+1 Class Size

Plaintiffs argue that the CSE did not rely on the private psychologist's examination or take her recommendations into consideration. Plaintiffs argue that the 8:1+1 class size recommended by the CSE does not provide the level of "substantial support" that the psychological report recommends. Plaintiffs contend that the March 2021 CSE was aware that G.E. was progressing in her class at Rebecca with its 2:1 DIR/Floortime component, and urge that no evidence in the record

suggested that G.E. could perform just as well in a less restrictive class. Further, Plaintiffs argue that Defendant's witness's testimony in support of the 8:1+1 class was vague and conclusory.

Plaintiffs are incorrect that the CSE did not rely on the psychological report or take its recommendations into consideration. As has already been discussed, the March 2021 CSE reviewed the data from the psychological report through its review of the May 2020 IEP. The May 2020 IEP contained detailed test results and recommendations from the psychological report. As the SRO correctly noted, many of those recommendations were included in the March 2021 IEP.

Further, the psychological report indicates that G.E. requires a "small class size in a small school." The psychologist does not define the term "small class size." I defer to the SRO's finding that the 8:1+1 class size is small enough to meet G.E.'s needs. The SRO's finding comports with New York State regulations, which provide that 8:1+1 class sizes are intended to address the needs of "students whose management needs are determined to be intensive[] and requiring a significant degree of attention and intervention." 8 N.Y.C.R.R. § 200.6(h)(4)(ii)(b). That certainly describes G.E. In the past, Plaintiff had described G.E.'s pre-school program – also a class size of eight students, albeit with 2 teachers rather than 1 – as providing "a lot of support." In her year at Rebecca, G.E. was in a class with 7 students. And while the March 2021 IEP did not include a 2:1 component of DIR/Floortime instruction, it offered G.E. 1:1 instruction in ELA and math – which is more restrictive than anything she was being offered at Rebecca. Finally, the school psychologist testified that the CSE considered other class sizes and, considering G.E.'s progress, the 8:1+1 class size would be "the least restrictive setting" in which the child could make meaningful progress. SRO Dec. 20; *see M.H.*, 685 F.3d at 224. That, of course, is the legal standard; a child is not entitled, at public expense, to be placed in the setting in which she is likely to make "the most" progress.

Plaintiffs' argument that G.E. was progressing at Rebecca does not mean that she would not progress at all in a less restrictive setting. Districts need not replicate the identical setting used in private schools. *M.C. ex rel. J.C. v. Mamaroneck Union Free Sch. Dist.*, 2018 WL 4997516, at *28 (S.D.N.Y. Sept. 28, 2018). This court is ill equipped to discern whether a 7:1+3 placement with a 2:1 DIR/Floortime component offers this particular child a significantly greater benefit than an 8:1+1 placement with individualized instruction in key subjects. Considering the deference I owe to the SRO on this matter, I see no reason to divert from the SRO's determination that the 8:1+1 class size did not render the March 2021 IEP substantively inappropriate.

### B. The March 2021 IEP's Omission of the DIR/Floortime Methodology

Plaintiffs assert that the DIR/Floortime methodology was not discussed by the March 2021 CSE. Plaintiffs argue that the district's lone witness (the school psychologist) did not attend the IEP meeting and so could only speculate at the hearing that the DIR/Floortime methodology was discussed by the March 2021 CSE. Further, Plaintiffs argued that since there were no evaluative materials at the IEP meeting suggesting that G.E. could benefit from anything other than the DIR/Floortime methodology, the CSE was required to include the DIR/Floortime methodology in the March 2021 IEP.

The omission of the DIR/Floortime method does not amount to the denial of a FAPE. In general, the specific teaching methodology is properly left to the teacher's discretion. *Rowley*, 458 U.S. at 207; *A.S. ex rel. S. v. N.Y.C. Dep't of Educ.*, 573 F. App'x 63, 66 (2d Cir. 2014). An IEP is substantively inappropriate only where there is a "clear consensus" that a student requires a particular methodology and the IEP does not guarantee use of that methodology. *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 194 (2d Cir. 2012). Contrary to Plaintiffs' assertion, there is no "clear consensus" that the DIR/Floortime methodology is required for G.E. to make progress at

25

school. The psychological report did not specifically recommend DIR/Floortime. Instead, as the SRO found, the psychological report merely identified as a methodology from which G.E. *could* benefit. Moreover, the SRO found that the district's evidence showed that G.E. could benefit from other methodologies, including 1:1 instruction in certain subjects.

The reason for the psychological report's recommendation for a methodology such as DIR/Floortime was to address G.E.'s attention and emotional regulation challenges and to address the connection between G.E.'s sensory processing profile and her self-regulation. SRO Dec. 22. The March 2021 IEP identified in great detail G.E.'s sensory needs, including the need for repetition, visual supports, movement breaks, redirection, and much more, and included learning goals and recommendations for a variety of supports, strategies and services to address G.E.'s sensory and educational needs, such as physical education, OT, PT, speech-language therapy, and opportunities for 1:1 instruction. The SRO properly held that the CSE's omission of the DIR/Floortime method did not render the March 2021 IEP substantively inappropriate.

## C. The Proposed Placement's Ability to Implement the IEP

Plaintiffs argue that the IHO and SRO erred in finding that the district met its burden of demonstrating that the proposed placement was capable of implementing G.E.'s IEP. Plaintiffs argue that they were not provided with any information about the class G.E. would have been placed at, the methodology used, or the students who would be in G.E.'s classroom and whether they would have a profile similar to G.E's. Further, Plaintiffs were purportedly unable to visit the proposed placement before G.E.'s 12-month school year began on July 2, 2021. Plaintiffs also claim that the IHO and SRO improperly placed the burden on Plaintiffs to demonstrate that the school was improper, when the burden should have been placed on the district to demonstrate that the program was proper.

Plaintiff's argument that the proposed public school placement would have be unable to implement the IEP is purely speculative, and therefore insufficient to challenge to the proposed placement. *R.E.*, 694 F.3d at 195 ("Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."). As I have discussed above, the parents made a minimal effort to obtain information about the public school placement. As the SRO observed, this is not a case where the parents repeatedly attempted to obtain information about the school but were denied. *Cf. F.B. v. N.Y.C. Dep't of Educ.*, 132 F. Supp. 3d 522, 542-45 (S.D.N.Y. 2015) (finding a procedural violation where the parents repeatedly attempted to obtain information about a proposed public school placement, but the district delayed in assigning a placement and failed to respond to the parents' written inquiries). Plaintiffs cannot hide behind their ignorance to assert that the proposed placement lacks the capacity to implement G.E.'s IEP when there is no evidence that they made more than a cursory effort to obtain the necessary information.

Without citing a single case, statute, or regulation, Plaintiffs assert that, "It is well-settled that the district bears the burden of proving that the recommended school can implement the IEP." Pl. Mem. Supp. 19. Plaintiffs' counsel misstates the law. "[A]bsent non-speculative evidence to the contrary, it is presumed that the placement school will fulfill its obligations under the IEP." *E.B. v. N.Y.C. Dep't of Educ.*, 2016 WL 3826284, at *9 (S.D.N.Y. July 12, 2016) (internal quotation omitted); *see also J.M. v. N.Y.C. Dep't of Educ.*, 171 F. Supp. 3d 236, 249 (S.D.N.Y. 2016) ("If a student's IEP is substantively adequate, it is incumbent upon the parents to adduce some evidence that the school could not or would not have adhered to the IEP."). Plaintiffs have not made a single factual allegation regarding the proposed public school placement's *capacity* to implement G.E.'s IEP. Because Plaintiffs' objections to the proposed placement's ability to

27

implement G.E.'s IEP are purely speculative, no duty is triggered on behalf of the district to demonstrate that the proposed placement was able to implement the IEP.

### IV.      The Appropriateness Unilateral Placement and Equitable Considerations

The IHO found that Rebecca was an appropriate placement for G.E., and the SRO did not reach this issue. Nonetheless, Plaintiffs reaffirm that Rebecca was appropriate for G.E. for a number of reasons, including that it specializes in educating students with neurodevelopmental delays, provided PT, OT, speech-language therapy, and counseling, utilizes the DIR/Floortime methodology, has a 2:1 classroom ratio, has sensory gyms, qualified staff, and more. Moreover, since Defendant did not appeal this finding to the SRO or to this Court, Plaintiffs argue that the IHO's finding is final.

Whether Rebecca was an appropriate placement for G.E. only becomes relevant if there is a finding that the CSE denied the student a FAPE. In this case, the SRO correctly concluded that the CSE did not deny G.E. a FAPE. Therefore, there was no need for the IHO to reach the issue of the appropriateness of Rebecca as a unilateral placement, and it was error to do so. As long as the district is providing the child with a FAPE, it has no obligation to subsidize the parents' unilateral placement anywhere else. *M.C.*, 226 F.3d at 66; *Walczak*, 142 F.3d at 134; *M.T. v. N.Y.C. Dep't of Educ.*, 200 F. Supp. 3d 447, 455 (S.D.N.Y. 2016).

Plaintiffs also argue that the IHO improperly found that Plaintiffs' actions were unreasonable. Again, because the SRO correctly concluded that the CSE did not deny G.E. a FAPE, there is no need to consider the equities. *M.C.*, 226 F.3d at 66.

## CONCLUSION

For the reasons above, Plaintiffs' motion for summary judgment is DENIED and Defendants' cross motion for summary judgment is GRANTED. The Clerk of the Court is respectfully requested to remove ECF Nos. 15, 24, and 25 from the Court's list of pending motions.

This constitutes the decision and order of the Court.

Dated: April 4, 2024

_____

U.S.D.J.

BY ECF TO ALL COUNSEL